IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ex rel.  )
RHONDA SALMERON, Relator,         )
                                  )
                Plaintiff,        )
                                  )
     v.                           )    No.  05 C 4453
                                  )
ENTERPRISE RECOVERY SYSTEMS, INC., )
et al.,                           )
                                  )
                Defendants.       )

<u>MEMORANDUM OPINION AND ORDER</u>

This matter is before this Court for decision in response to
the motions to dismiss with prejudice that have been advanced by
all defendants and on which all parties have had their say.  This
Court of course recognizes the seriousness of imposing that
ultimate sanction because of a litigant's or lawyer's conduct
rather than deciding a case on the merits (a subject discussed
later in the <u>Conclusion of Law</u> section), so that this memorandum
opinion and order will begin with a brief recital of the
background leading to that conclusion, followed by a more
detailed recital of the facts and then by the conclusion itself.
For the reasons set forth below, the several motions are granted
and this case is dismissed in its entirety.

**Background Summary**

This action has been pending for over three years.
Throughout the course of this litigation, counsel Jorge Sanchez
("Sanchez") for relator Rhonda Salmeron ("Salmeron") has engaged

in a virtually unbroken pattern of dilatory and irresponsible conduct that has regularly included missed deadlines, repeated requests for extensions of time, failure to comply with this Court's orders and procedures and failure to attend status conferences. Indeed, this Court took the unusual step of dismissing this case sua sponte for want of prosecution in May 2008, although it then--as it had forecast it would probably do--reinstated the case on Sanchez' claimed explanation as to his past delinquencies and his assurance of future compliance.[1]

After this Court had thus granted Salmeron's motion to reopen the case, Salmeron--through counsel Sanchez--did not comply with the promise to toe the line going forward. In addition to some further noncompliance with procedural requirements, which although troublesome might not have called for any severe response, counsel Sanchez committed a far more serious breach: He deliberately disclosed confidential and highly sensitive contractual documents that he had obtained through discovery on a limited disclosure basis. Sanchez has

---

[1] It should be made plain that the May 2008 order was <u>not</u> entered with any notion that it would be a death sentence for this lawsuit, as to which the teaching of such cases as <u>Gabriel v. Hamlin</u>, 514 F.3d 734, 736-37 (7th Cir. 2008) is that only egregious delays by litigants can justify such an action. To the contrary, its sole purpose was to bring forcefully to the attention of Sanchez, as Salmeron's counsel, the need to break his pattern of inattention to his obligations--else this Court would not have, as it did, invited a motion to rescind that order.

admitted providing those confidential documents to a reporter for the <u>Chronicle of Higher Education</u>, to an unidentified potential co-counsel and to Salmeron herself. Sanchez and Salmeron also cannot explain how the documents came to be posted (numbered with the Bates number stamps, an identifier that unequivocally confirms their origin as copies of the documents physically delivered to Sanchez and Sanchez alone) on Wikileaks, a worldwide website devoted (as the name implies) to the leaking of confidential documents.

In sum, the unprofessional and irresponsible conduct of Salmeron's counsel Sanchez leaves this Court no considered choice but to dismiss this case with prejudice so as to protect the integrity of the judicial system. What follows next is the more extended statement of reasons for that conclusion and result.

## Findings of Fact

1. Salmeron filed this action on August 4, 2005 pursuant to the False Claims Act, 31 U.S.C. §3730(b)(1). Within the first six months after filing the case, Salmeron's counsel Sanchez began to exhibit a pattern of behavior that involved repeated delays and repeated noncompliance with this Court's orders.

2. On February 3, 2006[2] original defendant Enterprise Recovery System ("Enterprise") filed a motion to dismiss pursuant

---

[2] All other dates through Finding 7 were also during 2006, so any further year references will be omitted from those next Findings.

to Fed. R. Civ. P. ("Rule") 9(b) and 12(b)(6)(Dkt. 24). This
Court ordered that responses be filed by March 2 (Dkt. 28), with
a status date set for March 6 to see whether a reply was called
for.[3] Just after the March 2 due date (on March 3) Sanchez filed
a motion to file the response instanter, to be presented at the
March 6 hearing (Dkt. 34). Sanchez cited his workload and
personal issues as the reasons for the brief delay (Dkt. 33-1).[4]

3. On June 6 Enterprise filed a motion for a protective
order (Dkt. 59, 64). Sanchez filed a memorandum opposing the
proposed protective order, adding that he was "at a loss to even
assess whether the defendant's proposed order was made in good
faith...." Nonetheless Sanchez told this Court (Dkt. 66):

> For the time being plaintiff agrees not to disclose the
> documents to any third parties (except for the U.S.
> Attorney), or file any documents publicly until:
> 1) defendant has had an opportunity to propose docu-
> ments to be designated as confidential; 2) plaintiff

---

[3] In the past few years this Court has departed from its
once-near-automatic setting of a 1-2-3 briefing schedule to a
practice of ordering a responsive memorandum followed by an early
status hearing. Experience has taught that litigants often meet
head-on in the initial memorandum and response, thus obviating
the need for a movant to expend time (and the client's money) in
the preparation and filing of a reply.

[4] As will be seen, these Findings refer to Sanchez
throughout, although his co-counsel John Moran ("Moran") has also
appeared in court--infrequently--from time to time. This Court
has not troubled itself to listen to the tape recordings of the
many hearing dates referred to in these Findings to see if any of
those dates involved Moran's presence and Sanchez' absence--but
there is not the slightest question that virtually all (if not
all) of the appearances that involved claimed explanations of and
excuses for delayed filings were by Sanchez.

> has had a chance to agree or dispute such proposed
> designations; and 3) this Court has had the opportunity
> to rule on any disagreement brought before it.

On June 14 this Court granted Enterprise's motion for a protective order "on a counsel's eyes only basis with a formal written order to be submitted" (Dkt. 68).

4. Next, on July 28 Enterprise filed its Second Amended Motion for Entry of a Protective Order (Dkt. 74). On August 2 this Court granted the motion but directed counsel for the parties to revise the order (Dkt. 75). Then on August 3 Enterprise and Salmeron submitted the revised protective order, which this Court signed and entered (Dkt. 77).

5. On October 16 added defendant United States Aid Funds, Inc. ("USA Funds") filed a motion to dismiss the First Amended Complaint (Dkt. 96). This Court ordered Salmeron to file her response to the motion by November 17 (Dkt. 100), again setting a status date shortly thereafter to consider whether to schedule a reply.

6. On November 13 counsel for Salmeron and for USA Funds held their initial discovery planning conference, with USA Funds represented by its former counsel Mark Sweet ("Sweet") of Wiley Rein, LLP (then known as Wiley Rein & Fielding, LLP). Sweet participated by telephone and told Sanchez that to protect USA Funds' documents, it would want the same undertakings and assurances that were afforded by the protective order in place

between Enterprise and Salmeron.  In response Sanchez agreed during that conference to treat certain documents identified by USA Funds as being for "attorneys' eyes only" until such time as a modified protective order could be entered.

7.  On November 20 (once again after the due date had passed) Sanchez filed a motion to file Salmeron's response to USA Funds' motion to dismiss instanter, to be presented at the November 27 status hearing date (Dkt. 109).  To complete the parallel to Finding 2, Sanchez again cited his workload and family obligations as the reasons for the delay.

8.  On January 31, 2007[5] USA Funds made its first production of documents, which included the Third Amended and Restated Guarantee Services Agreement between USA Funds and Sallie Mae, Bates-labeled USAF00000001-USAF00000060.  In the cover letter accompanying that production, Sweet specifically stated that there were certain documents for which USA Funds would be seeking confidential treatment, expressly including the Guarantee Services Agreement between USA Funds and Sallie Mae.  Sweet went on to say that he had circulated a draft joint motion for entry of a modified protective order and that USA Funds would "move for confidential treatment of these documents when that order has been entered."

---

[5]  Because all other dates through Finding 15 were also during 2007, once again no year references will be repeated in those next Findings.

9.   Sanchez had informed USA Funds' counsel that he wanted to make some additional modifications to the protective order so that it would cover documents from Salmeron's home computer.  On February 1 Sanchez e-mailed Sweet, explaining that he had not yet had an opportunity to review the proposed modification (in part because of his workload), but that he would do so and that he was "sure we can get this worked out to the parties' and Court's satisfaction."

10.   Salmeron's responses to USA Funds' interrogatories and its request for production of documents were due on February 19, but USA Funds received no such responses.  Nonetheless, on March 2 USA Funds made <u>its</u> second production of documents.  In the cover letter accompanying that production, Sweet reiterated that USA Funds "remains interested in seeking confidential treatment" for the Guarantee Services Agreement between USA Funds and Sallie Mae.  Sweet again asked Sanchez to provide edits to the draft motion for entry of a modified protective order he had circulated in January, and he again stated that USA Funds would move for confidential treatment once the order had been entered. Sweet also inquired about the status of Salmeron's overdue responses to interrogatories and discovery requests.

11.   On March 23 this Court held a previously-scheduled status conference, but Sanchez failed to appear.  Nor did Sanchez submit the delinquent responses to the interrogatories until

April 30, more than two months after they were due.

12.   On May 18 Enterprise filed a motion to compel and for sanctions (Dkt. 145) because Salmeron had also failed to respond to Enterprise's interrogatories and requests for production, which had become due on or about April 9.  Although Sanchez had previously represented that the information would be provided before May 11, he had failed to provide any of the items.  This Court granted Enterprise's motion to compel in part but denied its request for sanctions.  It ordered Salmeron to comply with the motion to compel by May 29 (Dkt. 147).

13.   On October 22 this Court ordered Salmeron to file a response to Enterprise's motion to dismiss the Second Amended Complaint on or before November 5 (Dkt. 168).  Salmeron filed neither the ordered response nor a request for extension, waiting instead until November 14 to file a motion for leave to file a Third Amended Complaint ("TAC")(Dkt. 170).  This Court promptly ordered Sanchez to provide a copy of the proposed TAC to defense counsel to determine if there were any objections, scheduling a status conference for November 26 (Dkt. 171).

14.   At that status hearing this Court granted leave to file the TAC (Dkt. 172), instructing that Enterprise's motion to dismiss the Second Amended Complaint would apply to the TAC and ordering Salmeron to file a response to the motion on or before December 10.  As it had done with the other timetables, this

Court scheduled a status hearing for December 17 (Dkt. 172).

15. In accordance with his consistent pattern, Sanchez did not file either the required response or a motion for an extension on or before December 10. And true to form, on December 17 Sanchez filed a motion for leave to file a response instanter, once more citing his workload as the reason for the delay. This time Sanchez provided a copy of his motion to opposing counsel and this Court only minutes before the scheduled status hearing. At the conclusion of the hearing this Court ordered Sanchez to file the TAC by December 26 (Dkt. 180).

16. On December 20 Sanchez filed a motion for an extension of the December 26 deadline to January 4, 2008[6] for filing the TAC. Unsurprisingly Sanchez cited his workload, family obligations and the Christmas holiday as the reasons that an extension was needed (Dkt. 177). This Court granted the motion and rescheduled the status hearing to January 29 (Dkt. 182).

17. Despite this Court's having granted the requested extension, Sanchez again submitted nothing--neither the TAC nor a motion for an extension--by the January 4 deadline. During January this Court's minute clerk consequently called Sanchez to inquire about the status of the filing and was told that the filing was forthcoming. But Sanchez neither attended the

---

[6] With the most limited exceptions, all other dates through the remaining Findings were also during this year, so that further year references to those 2008 dates will be omitted.

January 29 status hearing nor filed the TAC before that hearing. This Court ordered Salmeron to file the TAC by February 5, warning that the pending motions to dismiss would be granted if that deadline was not met (Dkt. 183).

18. Mirabile dictu, Sanchez did file the TAC on February 5, adding as defendants Sallie Mae, Inc., USA Group Guarantee Services, Inc., USA Servicing Corp. and Sallie Mae Servicing, L.P. (Dkt. 185). That pleading alleged (1) that USA Servicing Corp. was the successor in interest to USA Group Guarantee Services, Inc. (TAC ¶37), (2) that Sallie Mae Servicing, L.P. was in turn the successor in interest to USA Group Guarantee Services, Inc. (id. ¶38) and (3) that Sallie Mae Servicing, L.P. had been dissolved, with Sallie Mae, Inc. being the successor in interest to all three of those entities (id. ¶39). Sallie Mae, Inc. (hereafter simply "Sallie Mae") does not contest the allegation that it is the successor in interest to those three now nonexistent entities.

19. On March 7 defendants Enterprise, Scott Nicholson and USA Funds moved to dismiss the TAC (Dkt. 192-204), and USA Funds also sought summary judgment. This Court entered a scheduling order that required Salmeron's responses to be filed by April 11 and scheduled a status hearing for April 16 (Dkt. 206).

20. On April 9 Sanchez filed still another motion for an extension (Dkt. 207)--once again his workload and other

obligations were cited as reasons for the delay.  This Court once more granted the extension, establishing a new deadline of April 18 for the responses and continuing the status hearing until April 22 (Dkt. 209).

21.  This Court should have known better:  Sanchez failed either to file the responses or to seek an extension on or before April 18, and on April 21 this Court entered a sua sponte order rescheduling the April 22 status hearing to May 9 (Dkt. 219).  Then on May 1, despite the expiration of the April 18 deadline, Sanchez filed still another motion to extend the filing date for the responses until May 6 (Dkt. 220).  That motion too cited Sanchez' workload as one of the reasons for the missed deadline, but it also added his concern over filing the responses before Sallie Mae filed its anticipated motion to dismiss on May 5.  This Court granted the requested extension to May 6 (Dkt. 223).

22.  Plus ça change, plus c'est la même chose:  Sanchez again failed to comply with this Court's order referred to in Finding 21 and did not file the responses before the new deadline.  Meanwhile, on May 5 Sallie Mae did file its motion to dismiss the TAC (Dkt. 224).  In its motion Sallie Mae advised this Court that it was in discussions with Sanchez for the voluntary dismissal of the three nonexistent entities (see Finding 18) and that if a resolution could not be reached, a motion would be filed on their behalf to adopt Sallie Mae's

11

motion to dismiss.

23.   On May 8 Sanchez communicated with this Court's chambers and requested a continuance of the May 9 status hearing, saying that the continuance was needed so that the delinquent responses could be filed before the hearing--specifically by the afternoon of May 9.  This Court rescheduled the status hearing to May 16 (Dkt. 228).

24.   May 9 came and went without the promised responses or even another request for an extension.  In candor, the depressing recital to this point leaves this Court astonished that it did not call a halt earlier, but on May 14 it entered an order dismissing this action for want of prosecution, even then making it clear that it would entertain a promptly-filed motion to reopen the case under Rule 59(e) (Dkt. 231).[7]  On May 15 (perhaps the first time that he acted expeditiously) Sanchez filed a motion to alter the judgment and reopen the case (Dkt. 233).

25.   On May 21 this Court heard argument on Sanchez' motion to reopen Salmeron's case.  Although this Court granted the motion, it did so with substantial misgivings, granting Enterprise's motion for sanctions, emphasizing that this was Sanchez' final warning and expressing its discontent with Sanchez' "extensive pattern of noncompliance" (May 21 Tr. 8:10 to

---

[7]   This is somewhat reminiscent of the old saw that the best way to get the proverbial mule's attention is to strike it between the eyes with a two-by-four (see n.1).

8:17). Even so, Sanchez has still not paid those sanctions to date.

26. On June 16 Sanchez filed a motion to compel against Enterprise (Dkt. 243), but did so without first attempting to conduct a meet-and-confer conference as required by Rule 37(a)(1), LR 37.2 and this Court's Case Management Procedures. This Court ultimately denied that motion, based in part on Sanchez' failure to comply with those rules and procedures, and it entered and continued Enterprise's motion for sanctions (Dkt. 266).

27. On June 24 USA Funds, Sallie Mae and Enterprise learned that on June 20 a scanned copy of the USA Funds-Sallie Mae Third Amended and Restated Guarantee Services Agreement had been posted on a website known as Wikileaks.org ("Wikileaks"). Wikileaks touts itself as "an uncensorable version of Wikipedia for untraceable mass document leaking and analysis" (http://wikileaks.org/wiki/ Wikileaks:About). Along with the document itself, the leaker provided a purported summary of the document and posed 13 inflammatory questions about the possible "criminality" of the arrangement.

28. Just two days later (on June 26) the <u>Chronicle of Higher Education</u> ("<u>Chronicle</u>") published an online article captioned "Contract Raises New Concern over Sallie Mae's Ties to Guarantor" about the leaked contract. That article raised

13

questions about the Guarantee Services Agreement and stated
(emphasis added):

> A copy of the 51-page contract between Sallie Mae and
> USA Funds, along with some more recent letters updating
> its terms, was posted Friday to the Internet by
> Wikileaks, a Web site that specializes in publishing
> documents provided by anonymous whistle-blowers. **The
> Chronicle had obtained the same document several days
> earlier and had no involvement in providing the
> materials to Wikileaks.**

On July 2 and July 3 the <u>Chronicle</u> published two additional
articles regarding the leaked contract.

29.  Importantly, the Agreement both leaked to Wikileaks and
provided to the <u>Chronicle</u> bears the Bates labels USAF00000001-
USAF00000060.  That conclusively establishes that document's
source as the selfsame document that USA Funds had provided to
Sanchez in keeping with its discovery obligations.  And on at
least three occasions USA Funds had identified the document as
being confidential and advised Sanchez that it intended to seek
confidential treatment for the document as soon as a modified
protective order had been entered.

30.  Under the terms of the agreement that had been reached
at the November 13, 2006 initial discovery planning conference,
Sanchez was obligated to treat that document as being for
"attorneys' eyes only" until such time as a modified protective
order could be entered.  Such a restriction is of course based on
the assumption (unfortunately mistaken in this instance) that
counsel may be relied on to maintain the integrity of required

14

confidentiality, while even the client (to say nothing of third persons) does not owe the same level of professional or other obligations to the court.

31. On June 25 counsel for USA Funds communicated with Sanchez as to the publication of the document on Wikileaks. In an e-mailed response Sanchez did not deny releasing the document, but rather attempted to justify his behavior.

32. On June 26 a copy of the Wikileaks article, as well as the disclosed documents, also appeared as a link on the message board of Yahoo Finance (http://messages.finance.yahoo.com/ Stocks_(A_to_Z)/Stocks_U/threadview?m=tm&bn=16717&tid=10906) &mid=10906&tof=1&frt=2). Yahoo Finance is a website that reports and analyzes financial information, including information regarding investing, various financial markets and company finances (http://finance.yahoo.com/).

33. On July 1 USA Funds filed a motion in this action to dismiss and for a protective order (Dkt. 246). On the same day Sallie Mae, Inc., USA Group Guarantee Services, Inc., USA Servicing Corp. and Sallie Mae Servicing, L.P. filed their motion to adopt USA Funds' motion (Dkt. 251), a motion that this Court granted on July 21 (Dkt. 266). Enterprise also joined USA Funds' motion.

34. Sanchez has admitted that he released the document to a reporter with the <u>Chronicle</u>, to an unnamed attorney and to

Salmeron herself (Dkt. 257). Sanchez offered several purported but totally unconvincing excuses for that truly indefensible behavior, including (1) his forgetfulness as to USA Funds' repeated requests for a modification to the protective order, (2) his not keeping the document with the cover letter that specified that it was to be treated as confidential and (3) his unwise judgment (Dkt. 257).

35. On July 3 this Court heard argument on the motions to dismiss. Sanchez' argument plainly evidenced his failure to appreciate the seriousness of his actions, and this Court just as plainly confirmed its dissatisfaction with his attempted responses and advised him that it did not wish to hear any more excuses. Sanchez requested time to research what sanction short of dismissal might be appropriate, and this Court ordered him to do so by July 11.

36. Sanchez did file his Submission on Sanctions on July 11 (Dkt. 257). There he acknowledged that the parties had agreed to modify the original protective order to include all parties and that he had wholly failed to comment on the proposed protective order that had long since been submitted to him by USA Funds for that purpose. Despite those admissions, Sanchez once again asserted at great length his workload and family obligations as the primary reasons for the failure to honor his acknowledged agreement not to disclose a confidential document.

37.  Although it is not yet known just how Wikileaks obtained a copy of the specific confidential document that had been delivered only to Sanchez, he has expressly admitted delivering a photocopy to the <u>Chronicle</u>.  That conduct, like most (if not all) of Sanchez' repeated violations of his responsibilities to this Court and opposing counsel, must be characterized as willful.  And with Sanchez having disclaimed the Wikileaks transmittal even while acknowledging the delivery to the <u>Chronicle</u>, this Court has no assurance that the Wikileaks delivery may not be traceable back to Salmeron herself (an unauthorized distributee in her own right).

38.  Moreover, the unauthorized disclosures have publicized to USA Funds' and Sallie Mae's competitors their trade secrets, including but not limited to pricing, performance incentives, new and enhanced product information, service level standards and the scope of the services provided under the document.  In addition, USA Funds and Sallie Mae have suffered significant negative publicity by virtue of the articles resulting from the unauthorized disclosures.

39.  As to Enterprise, the unauthorized disclosures of the document have coincided with its response to the Education Department collection request for proposal.  Although the full effect of that is unknown at this time, the appearance of the article in the <u>Chronicle</u> may well cause further loss of business

for Enterprise.

40. Nor is the damage referred to in the preceding Findings (though both real and serious) either curable or quantifiable, because the document was posted to a website that is devoted to the publication of confidential information. USA Funds' and Sallie Mae's demands that the document be removed have been ignored. Indeed, even if Wikileaks were to remove the document, the harm is done, for the information is in cyberspace and cannot be pulled back.

41. On a collateral issue, during the July 31 status hearing the counsel for Sallie Mae, Inc. and the three nonexistent entities referred to in Finding 18 advised this Court that he had been seeking the voluntary dismissal of those entities for some time, but without success. Sallie Mae's counsel further advised this Court that Sallie Mae, Inc. was not contesting that it is the successor in interest to the three nonexistent entities. At the hearing this Court admonished Salmeron's counsel Sanchez to dismiss those entities, because failure to do so with prejudice would effectively allow Salmeron to circumvent this order as to Sallie Mae, Inc.

### Conclusion of Law

Sanchez'--and hence Salmeron's--persistent flouting of court deadlines, coupled with periodic no-shows at scheduled status dates, has both interfered with the due administration of justice

and imposed added costs on the defendants. In the latter respect, recompense might perhaps take the form of a shifting of fees, while in the former respect this Court might well have been less patient and fired a shot across Salmeron's bow earlier than its May 14, 2008 dismissal for want of prosecution, coupled as it was with an invitation to seek the lawsuit's reinstatement and to sin no more.[8]

But it is unnecessary to decide whether Sanchez' repeated--almost universal--violations that have been detailed in the Findings of Fact would cumulatively rise (or fall) to the level that would meet the caselaw standard for dismissal, because the latest breach is an offense far greater in kind rather than in degree. It is truly inexcusable, no real explanation has been offered, and its damaging effect cannot be quantified in the same way that looking at defense counsel's time charges and compelling Salmeron to pay them might provide a remedy for the earlier procedural violations.

Salmeron's just-filed Relator's Opposition to Proposed Dismissal Order, after speaking of the stringent standard

---

[8]  Frankly, this Court had not focused on just how often and how consistently Sanchez had not followed court orders until this opinion gave it the occasion to review and recount those violations. Needless to say, a substantial number of the individual instances had produced a "What, again?" reaction on this Court's part--but this is after all one of a couple hundred civil and criminal cases on this Court's calendar, so that keeping count of Sanchez' offenses would have been at odds with a constructive budgeting of judicial time.

applicable to any dismissal attributable to a litigant's delays (something that this Court has made clear is not the triggering factor here), lays its principal stress on the nonexistence of an order that placed a mantle of protection over the document that has inexcusably been opened to public disclosure (an understatement) by Sanchez.  With all respect, that contention brings to mind the hoary anecdote about the young man who, having murdered both his parents, asks the court's mercy on the ground that he is an orphan.  Here the absence of a protective order, sought from the beginning by USA Funds in a request that was then expressly tied to the document later published because of Sanchez' misconduct, is unquestionably due to <u>Sanchez</u>' failure to provide a response as he had promised.  Sanchez' argument on that score is totally without merit.[9]

There is no question as to this Court's authority to order the ultimate sanction of dismissal in the face of such egregious conduct--or as to the propriety of doing so.  <u>Nat'l Hockey League v. Metro. Hockey Club, Inc.</u>, 427 U.S. 639 (1976) made that plain more than three decades ago in the context of repeated violations in the course of discovery (an area less damaging to the opposing party than Sanchez' current misconduct)--here is the relevant excerpt from that per curiam opinion (<u>id</u>. at 643):

---

[9]  This Court has given full consideration to all other contentions in Relator's Opposition.  None affects the analysis and result set out here.

But here, as in other areas of the law, the most severe
in the spectrum of sanctions provided by statute or
rule must be available to the district court in
appropriate cases, not merely to penalize those whose
conduct may be deemed to warrant such a sanction, but
to deter those who might be tempted to such conduct in
the absence of such a deterrent.

Far more recent cases in our own Circuit have reconfirmed
and applied that teaching. Two of them merit both citation and
quotation.

First, here is a relevant excerpt from the very beginning of
<u>Dotson v. Bravo</u>, 321 F.3d 663, 665 (7th Cir. 2003):

"[T]here are species of misconduct that place too high
a burden...for a court to allow a case to continue."
<u>Barnhill v. United States</u>, 11 F.3d 1360, 1368 (7th Cir.
1993).

Then, after quoting from <u>Nat'l Hockey League</u>, <u>Dotson</u>, <u>id</u>. at 667
went on to say:

Further, it is axiomatic that the appropriateness of
lesser sanctions need not be explored if the
circumstances justify imposition of the ultimate
penalty--dismissal with prejudice.

Finally, turning to "the court's inherent authority to rectify
abuses to the judicial process" (<u>id</u>., citing <u>Chambers v. NASCO,
Inc.</u>, 501 U.S. 32, 49 (1991), <u>Dotson</u>, 321 F.3d at 668 quoted this
from <u>Barnhill</u>, 11 F.3d at 1368:

Misconduct may exhibit such flagrant contempt for the
court and its processes that to allow the offending
party to continue to invoke the judicial mechanism for
its own benefit would raise concerns about the
integrity and credibility of the civil justice system
that transcend the interests of the parties immediately
before the court.

Most recently, <u>Wade v. Soo Line R.R.</u>, 500 F.3d 559 (7th Cir. 2007) addressed the propriety of visiting a lawyer's sins upon the client in these terms (<u>id</u>. at 564, most citations omitted):

> Attorneys' actions are imputed to their clients, even when those actions cause substantial harm. A litigant bears the risk of errors made by his chosen agent. Sanctions for misconduct are within the discretion of district judges, <u>National Hockey League v. Metropolitan Hockey Club</u>, 427 U.S. 639 (1976), and dismissing this case was not an abuse of discretion.

That same perspective, which focuses on the impact of lawyer conduct on the justice system and on the client's adversaries rather than on the client's situation, was strongly voiced as far back as <u>Link v. Wabash R.R.</u>, 370 U.S. 626, 633-34 (1962)(footnote omitted):

> There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney." <u>Smith v. Ayer</u>, 101 U.S. 320, 326.

Indeed, that approach is even less troublesome here. After all, if Salmeron's qui tam action has ultimate merit, she will have lost only the opportunity to grasp the brass ring of a

relator's share of the recovery.[10]  But the United States, which has until now declined to involve itself (thus permitting Salmeron to proceed as relator), might seek to take up the cudgels if that were the case, so that any culpable defendant would be taken to task.

In all events, what has been set out here amply demonstrates the appropriateness of a dismissal of this action with prejudice. This Court so orders.  By definition all pending merits-related motions are denied as moot.

_____
Milton I. Shadur
Senior United States District Judge

Date:  August 18, 2008

---

[10]  Because the current dismissal obviates the need to deal with the pending dispositive motions filed by defendants, this Court has no occasion to evaluate that possibility.